UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 11 Civ. 7394 (RJS)

———————————

GERARDO GUZZO,

Petitioner,

VERSUS

LUISA MARIA CRISTOFANO,

Respondent.

———————————

OPINION AFTER BENCH TRIAL
December 30, 2011

———————————

RICHARD J. SULLIVAN, District Judge:

Petitioner Gerardo Guzzo brings this action pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, seeking an order directing the return of his five-year-old son to Italy. The child is currently in the care of his mother, Respondent Luisa Maria Cristofano, in New York.

From November 7, 2011 through November 9, 2011, the Court held a bench trial in this matter. For the reasons that follow, Petitioner's application for relief under the Hague Convention is denied.

I. BACKGROUND

A. Findings of Fact[1]

Petitioner is an Italian citizen who was born and raised in Italy. (PTO at 11.) Respondent is a United States citizen who grew up in the Bronx, New York. (*Id.*) The parties met in September 2005, while on a flight from New York to Italy. (Aff. of Luisa Cristofano, dated Oct. 30, 2011 ("Cristofano Aff.") ¶ 4.) At that time, Petitioner lived – and continues to live – in Scario, Italy. (Aff. of Gerardo Guzzo, dated October 5, 2011 ("Guzzo Aff.") (¶ 1.) Respondent, who was traveling to Italy to attend a wedding, resided at her home in

———————————

[1] The following facts are taken from the evidence presented at trial, the trial transcript ("Tr."), and the joint pre-trial order ("PTO").

Westchester County. (Cristofano Aff. ¶¶ 4-5.) Petitioner and Respondent are both attorneys with small practices near their respective homes. (PTO at 11.)

After their initial meeting, the parties remained in contact, and, in October 2005, Petitioner visited Respondent in New York. (Cristofano Aff. ¶¶ 6-7.) During that visit and subsequently, the parties discussed marriage. (*Id.*) The parties' plan was to have a "bi-continental" marriage, in which "[Respondent] would live in New York, [Petitioner] would live in Italy, and [the parties] would go back and forth." (Tr. 155:8-11.)

In the subsequent months, Respondent traveled once to Italy, and Petitioner made a second visit to New York. (Cristofano Aff. ¶¶ 7, 10.) The parties continued to discuss their plans for marriage as well as ways in which they could maintain their legal practices while away from their respective homes. Specifically, the parties discussed the prospect of Petitioner applying to LL.M programs in New York. (*See* Ex. BB.) Also, in December 2005, while Petitioner was visiting Respondent in New York, Respondent arranged for Petitioner to be interviewed on Radio Maria, a religious radio station with an Italian-American audience. (*See* Ex. X.) During the interview, Petitioner advertised his law practice and stated that he had a law office in Bronxville, at Respondent's business address. (*See id.*; Tr. 23:9-12.)

In January 2006, Respondent discovered that she was pregnant. (PTO at 11.) Respondent visited Petitioner in Scario in February 2006, at which time they discussed Respondent's pregnancy. The parties wished to marry, but disagreed over whether the wedding should take place in Italy or New York. (Tr. 299:12-300:18.) Petitioner told Respondent that if she agreed to live in Scario, he would marry her in a religious ceremony. (*Id.*) Respondent resisted, and the parties were ultimately married in a civil ceremony in New York while maintaining their bi-continental residences. (PTO at 11.)

In April 2006, Respondent moved from her house in Tuckahoe to an apartment that she owned in Bronxville. Respondent rented out the Tuckahoe house except for the basement, which she retained the right to occupy. (Cristofano Aff. ¶ 17.) Around this time, Petitioner continued to look for legal work in New York. Specifically, Respondent placed advertisements on Petitioner's behalf in an Italian-American newspaper and installed a nameplate for Petitioner at her Bronxville office. (Cristofano Aff. ¶¶ 6-7; Tr. 23:18-23; Ex. DD.)

In September 2006, the child was born. In the several years following the child's birth, the parties maintained their bi-continental marriage as originally contemplated. From 2006 through 2008, each party visited the other on numerous occasions. (*See* Ex. B.) In December 2007, the parties agreed on a visitation schedule pursuant to which Respondent would stay with Petitioner in Italy for a two-month period, and then return to New York for no more than twenty days. (Tr. 155:14-18.) Respondent testified that, through the end of 2008, she attempted to comply with that arrangement. (*Id*.) Despite the substantial amount of time that she was spending in Italy, Respondent maintained her New York law office, and even refused an offer to sell her practice to a pair of New York attorneys. (*See* Aff. of Richard Abbate, dated Oct. 27, 2011 ("Abbate Aff.") at ¶ 2.)

In July 2008, Respondent became pregnant again. (Cristofano Aff. ¶ 27.) The parties again argued over whether the child should be born in Italy or New York. (*Id.*) In August 2008, however, Respondent miscarried. (*Id.*) For the remainder of 2008, Respondent and the child spent the vast majority of their time in Italy. (Ex. B.) In November 2008, Respondent became pregnant once again. Petitioner asked Respondent to register in Scario as a local resident so that she would be eligible for state-funded medical insurance, but Respondent refused to do so. (Tr. 277:2-3.) Shortly thereafter, the parties' relationship became quite tumultuous. They argued often, and, ultimately, Respondent had another miscarriage. (Cristofano Aff. ¶ 32.) In February 2009, Respondent took the child back to New York and told Petitioner that she wanted a separation. (Tr. 52:21-53:23.)

Over the next several months, the parties and their counsel negotiated a separation agreement (the "Separation Agreement"), which was executed in English by Respondent on May 20, 2009, and in Italian by Petitioner on June 10, 2009. (Ex. A.) The Separation Agreement provided, among other things, that: (i) "[t]he parties shall continue to live separate and apart"; (ii) "[t]he Wife shall have custody[] of the minor child of the parties"; (iii) "the Husband shall pay child support to the Wife for the benefit of the minor child of the parties in the amount of Euro 500 per month"; and (iv) Petitioner "consents to [the child's] current registration in the Good Counsel Academy" in White Plains, New York. (*Id.*)

The Separation Agreement also provided for Petitioner's visitation rights as follows:

The husband and wife may agree to any reasonable periods of visitation of the child by the husband at any time, subject to reasonable notice and final approval by the wife as to the location and length of such visitation.  In view of the international aspect of this issue, however, the husband shall have the absolute and uncompromisable right of visitation during the months of July and August of each year in Italy, or such other two-month (or 60-day period) as shall be agreed upon by husband and wife with two months prior notice by either.

The husband shall also have the absolute right of visitation with respect to Christmas and Easter in alternating years.

When visitation occurs in Italy and until the child is 16 years of age, the wife shall accompany [the child] who will live with his father. At the husband's absolute and unreviewable discretion, the wife may live with the child during the 2-month period of visitation throughout the year; however, the wife shall have the right to find and live at her own apartment at her expense. . . . When [the child] shall become 16 years of age, he shall be able to travel alone and can go to Italy to visit his father who will pay for his international travel and his stay.

When visitation occurs in the USA, the husband may reside in the basement apartment at the wife's house at 34 Read Street, Tuckahoe, NY, at his discretion and rent free.

(*Id.*, Schedule A ¶ 4.)

After the Separation Agreement was signed by both parties, Respondent returned to Italy with the child. Respondent testified that her trip to Italy was undertaken as an attempt at reconciliation with Petitioner, but that she was only willing to make the attempt because she had the protection of the Separation Agreement. (Tr. 126:3-17, 153:20-154:22.) Respondent also testified that, regardless of the reconciliation attempt, she never intended to have the child attend primary school in Italy and that she always planned to live with the child in New York once he was in kindergarten. (Tr. 297:10-299:4.) Respondent spent most of the summer of 2009 in Scario, and, after a brief stay in New York, Respondent returned to Scario in November 2009 and the child began attending nursery school there. (PTO at 11.)

At the end of 2009, Respondent purchased a small cottage in the hills outside Scario for 30,000 Euros. (Tr. 255:18-256:4.) Respondent testified that she purchased the house because the Separation Agreement required her to bring the child to Scario each summer for two months for Petitioner's visitation. (Cristofano Aff. ¶ 40.)

In 2010, Respondent and the child spent the vast majority of the year in Scario, but periodically made trips to New York. (*See* Ex. B.) In September 2010, Respondent became pregnant yet again, but miscarried shortly thereafter. (Cristofano Aff. ¶¶ 44-45.) Around this time, the parties were arguing frequently, and in November 2010, Respondent took the child back to New York with the intention of not returning to Italy. (*Id.* ¶ 45.)

In late December 2010, Petitioner visited Respondent in New York and the parties agreed to make another attempt at reconciliation. (Cristofano Aff. ¶ 48.) Respondent and the child returned to Italy with Petitioner on January 10, 2011. (*Id.*) Over the next several months, however, the parties' relationship became tumultuous once again and, in August 2011, Respondent returned to New York with the child, where they have remained. (*Id.* ¶ 58.) Respondent has since enrolled the child at Good Counsel Academy in White Plains and has initiated a divorce proceeding in Westchester County. (*Id.*)

B. Procedural History

Petitioner initiated this action on October 12, 2011, by filing a writ of habeas corpus in the Supreme Court of the State of New York, Bronx County, pursuant to the Hague Convention and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11611. On October 19, 2011, Respondent removed the action to this Court, and Petitioner filed a motion to remand. On October 24, 2011, the Court denied Petitioner's motion to remand and scheduled a bench trial. The trial was conducted on November 7, 8, and 9, 2011. The parties submitted post-trial briefs on November 21, 2011.

III. ANALYSIS

A. Statutory Scheme

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010). The Convention's express objectives are "to secure the prompt

4

return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Art. 1.

Pursuant to ICARA, the Convention's implementing legislation, an aggrieved custody claimant may file a petition in state or federal district court for the return of a child located within the court's jurisdiction. In order to prevail on such a claim, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

If the petitioner successfully establishes a prima facie case of wrongful removal or retention, then the burden shifts to the respondent to establish one of the Convention's defenses, and if the respondent fails to do so the child must be returned. *See Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999).

### B. Habitual Residence

The central dispute in this matter concerns whether New York or Italy constitutes the child's place of habitual residence. After careful consideration of the evidence advanced by the parties, the Court finds that Petitioner has failed to demonstrate by a preponderance of the evidence that Italy, rather than New York, is the child's habitual residence.

In *Gitter*, the Second Circuit set forth a two-part test for ascertaining a child's habitual residence pursuant to the Hague Convention:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134.[2]

Here, the Court finds that the Separation Agreement, pursuant to which the parties agreed that Respondent would have custody of the child, live with the child in New York, and send the child to school in New York, constitutes the last shared intent of the parties.

Despite the unambiguous language of the Separation Agreement, Petitioner argues

---

[2] Petitioner initially advanced the alternative argument that even if New York was found to be the place of habitual residence, the child had become acclimatized to Italy such that Italy had become the child's new habitual residence. At trial, however, Petitioner abandoned that argument, conceding that he could not make the showing required under *Gitter*. (*See* Tr. 290:4-291:7.)

5

that the document fails to accurately reflect his intentions at the time it was executed. First, Petitioner argues that he was coerced into signing the Separation Agreement "by reason of . . . distress at the Mother's holding the child hostage." (Pet'r's Post-Trial Br. at 12.) Petitioner, however, grossly mischaracterizes the evidence presented on this issue at trial. Respondent did indeed condition her June 2009 trip to Italy – and her willingness to attempt to reconcile with Petitioner – on Petitioner signing the agreement. As Respondent testified at trial, the Separation Agreement provided her with "security" that, in the event that the reconciliation failed, she would be able to return to New York with custody of the child and resume her life according to the terms of the agreement. (Tr. 153:20-154:22.) However, Petitioner was aware of the rationale behind Respondent's condition, and nevertheless agreed to sign the Separation Agreement because it represented "the final attempt to save my marriage, [and] to make sure that once Luisa would be here there would be grounds for reconciliation." (Tr. at 60:9-12.)

Whatever hopes for reconciliation Petitioner may have harbored, therefore, Petitioner clearly understood the terms of the Separation Agreement and the binding nature of the document at the time he signed it. Petitioner's trial testimony demonstrates that he was well aware of the fact that, by entering into the Separation Agreement, he was consenting to his son "going to school in New York" and that "[his] wife was to have custody of him":

> THE COURT: You understood that according to this agreement your son was to attend school in New York State in the fall, right?
>
> THE WITNESS: Yes. Sure. It was written.
>
> * * *
>
> THE COURT: So you signed the agreement?
>
> THE WITNESS: Yes.
>
> THE COURT: Understanding that the terms of this agreement were that your son was to go to school in New York?
>
> THE WITNESS: Yes.
>
> THE COURT: And understanding that your wife was to have custody of him?
>
> THE WITNESS: I did sign it.
>
> THE COURT: You understood when you signed it that that was the condition, that was the terms of this agreement, correct?
>
> THE WITNESS: And I was also hoping that there were the conditions for us to obtain a reconciliation and ultimately having both of them in Italy.
>
> THE COURT: That was your hope, but the terms of the agreement were that she was to have sole custody and the child was [to] go to school in New York?
>
> THE WITNESS: Yes.
>
> * * *
>
> THE COURT: You signed this

document here, right?

THE WITNESS: Yes.

THE COURT: You have already said that's your signature on that document, right?

THE WITNESS: Yes.

THE COURT: You understood this was a legally binding document?

THE WITNESS: Yes.

\* \* \*

THE COURT: I am asking, when you signed this document, you understood that this document and its terms would be binding on you, correct?

THE WITNESS: Certainly.

(Tr. 60:13-61:15, 94:12-95:2.)

While Petitioner hoped that he and Respondent could effect a reconciliation after the Separation Agreement was executed, Petitioner's testimony plainly demonstrates his consent to the terms of the agreement. Regardless of whatever confidence Petitioner had in his ability to get Respondent to revisit the terms of the agreement once they were reunited, there is no evidence that the attempted reconciliation, in and of itself, altered the agreement in any way.[3]

Indeed, the terms of the Separation Agreement are consistent with the nature of the parties' relationship leading up to the execution of the document. From the time the parties met in 2005, they engaged in a "bi-continental" relationship in which "[Respondent] would live in New York, [Petitioner] would live in Italy, and [the parties] would go back and forth." (Tr. 155:8-11.) If anything, the parties' actions prior to the Separation Agreement suggest that Petitioner – and not Respondent – was open to relocating permanently. As noted above, Respondent placed advertisements in New York publications for legal work for Petitioner. (Cristofano Aff. ¶ 17; Tr. 26:6-8.) Petitioner appeared on a New York radio station, during which he stated that he had a law office in Bronxville, New York; and Respondent ultimately put Petitioner's nameplate on her office door. (Exs. X, DD; Tr. 23:18-23.) In contrast, the parties have put forward no evidence that Respondent sought legal work in Italy.

Petitioner additionally argues that, even if the Separation Agreement represented the intent of the parties at the time it was executed, the parties' subsequent actions demonstrate a changed shared intent that the child should be raised in Italy. Petitioner testified that, after the agreement was signed and Respondent went with the child to visit Petitioner in Italy, the parties "started to live as if the agreement had never existed." (Tr. 100:21-23.) Petitioner, for example, testified that Respondent made no effort to enforce the child support provisions of the Separation Agreement. Indeed, according to Petitioner:

In the second half of June 2009, we

---

[3] There is also no merit to Petitioner's argument that "fatal irregularities in the execution, acknowledgement, and delivery" of the Separation Agreement make the agreement "unenforceable as to custody." (Pet'r's Mem. at 12.) Regardless of whether the document is enforceable in family court, it is nevertheless clearly probative of the parties' "last shared intent" for the purposes of determining habitual residence under ICARA. *Gitter*, 396 F.3d at 134.

actually reconciled. We then replanned our life together. We went back to the time everything started, and we decided that we would have one roof over our heads, [the child] included, and that would be in Italy. . . . At one point we started behaving like a real family and we started to consider that agreement nonexistent, as if it never happened.

(Tr. 323:8-17.) Petitioner testified that, after this purported reconciliation, the parties developed a new "mutually shared opinion that [the child] would start the . . . first five years of primary school and the following three years of middle school" in Italy before moving to the United States to continue his secondary education. (Tr. 325:18-21.)

With respect to this assertion, the Court finds that Petitioner's testimony was not credible. Moreover, it is belied by the other evidence presented at trial. Significantly, Petitioner made no mention of the alleged conversations in which the parties reached a new agreement about where the child should be educated in any of his pre-trial affidavits, memoranda of law, or proposed findings of facts and conclusions of law. Indeed, Petitioner has put forward no evidence of any kind to corroborate his testimony on this issue, despite the abundance of e-mails and letters between the parties that were produced. Put simply, the Court finds Petitioner's assertion of a new "mutually shared intent" to educate the child in Italy to be a wholesale fabrication designed to meet the legal standard established by the Second Circuit in *Gitter*.

On the other hand, Respondent's conduct following the execution of the Separation Agreement, when viewed as a whole, is thoroughly consistent with her stated intention to educate the child in New York once it became time to enroll him in kindergarten. Despite the parties' apparently sincere attempts at reconciliation, the evidence demonstrates that Respondent never contemplated spending her life in Italy or having the child attend Italian schools following preschool. (*See, e.g.*, Tr. 297:15-299:4.) Moreover, Petitioner's argument that the parties abandoned the Separation Agreement is not persuasive. While it is undisputed that Respondent did not seek child support from Petitioner, the Separation Agreement provides that, during visitation periods in Italy, "the husband shall pay for the living expenses of the child . . . without having to pay to the wife the monthly support payment." (Ex. A, Schedule A at 2.) Additionally, Respondent's extended stays in Scario with the child by no means reflect a rejection of the Separation Agreement, given that the agreement provided that the parties may agree to "any reasonable periods of visitation" and that Respondent was free to reside with Petitioner and the child. (*Id.*)

Nor is the parties' decision to send the child to nursery school in Italy reflective of a changed intention to make Italy the child's habitual residence for the foreseeable future. Respondent testified credibly that, regardless of the outcome of the attempted reconciliation, she intended to send the child to kindergarten in New York, which Respondent considered the beginning of the child's formal education. (Tr. 298:7-20.) This is in contrast to the nursery school in Scario, which Respondent considered merely a "day care" meant to provide the child with opportunities for social interaction. (Cristofano Aff. ¶ 72; *see also* Tr. 298:7-17.) Respondent further testified, again credibly, that she made her intention clear to those close to her, such that

"everyone in [her] family . . . knew that [the child] would . . . start kindergarten in the United States." (Tr. 307:23-308:1.) Indeed, while the child was attending the nursery school in Scario, Respondent home-schooled him in English in order to prepare him for school in the United States. (Tr. 287:16-25.) Accordingly, in December 2010, Respondent registered the child at the Yonkers Board of Education, selecting three schools for the 2011-2012 school year. (*See* Cristofano Aff., ¶¶ 45-46; Ex. P.)

Respondent's intention to educate the child in New York is also evidenced by the fact that at all times – both before and after the Separation Agreement – Respondent maintained a fully operational law practice in New York. (Cristofano Aff. ¶¶ 16-17, 25, 33, 38, 79.) Respondent has put forward evidence demonstrating that, in the period following the execution of the Separation Agreement, she continued to perform work for New York clients and collaborate with attorneys in New York. (*See* Aff. of Rimonda Dalloul, dated Oct. 27, 2011, ¶¶ 2-3, 5.; Abbate Aff. ¶ 2.) Indeed, as noted above, in May 2008, Respondent refused an offer to sell her practice, stating that she had no intention of discontinuing her New York practice. (Abbate Aff. ¶ 2.)

Moreover, the evidence demonstrates that Respondent retained her New York real estate – another fact consistent with her stated intention to have the child attend school in New York. Despite renting out the Tuckahoe House, she retained exclusive use, possession, and occupancy of the basement apartment, which, pursuant to the Separation Agreement, Petitioner was permitted to use when visiting New York. (Ex. MM.) Additionally, the fact that Respondent purchased a small house outside of Scario undermines Petitioner's testimony that, after executing the Separation Agreement, the parties "decided that we would have one roof over our heads." (Tr. 323:10-11.) Indeed, Respondent's purchase of the house was consistent with the terms of the Separation Agreement, which allowed her to find her own accommodations during the child's summer visitation periods in Scario. (Cristofano Aff. ¶ 40; Tr. 63:21-24; Ex. A, Schedule A at 4.)

Additionally, and of particular significance, Respondent repeatedly refused to register the parties' marriage in Italy, which would have entitled her to state-funded health insurance while there. (Tr. 36:7-37:12.) Petitioner testified that he "pleaded with her on many occasions" to register so that she could "enjoy benefits that any Italian citizen enjoys," but she nevertheless resisted doing so. (*Id.*) The child likewise did not have Italian medical insurance, but rather was insured through Medicaid and received his primary medical treatment in the United States. (Exs. K, L, M; Tr. 71:19-24, 277:2-4.)

The Court's finding that New York is the child's place of habitual residence is consistent with recent Second Circuit case law on this issue. In *Gitter*, Israeli-born parents who had been living in New York for the entirety of their relationship decided to "try living in Israel for one year." *Gitter*, 396 F.3d at 128. After deciding to relocate, the parents "closed their New York bank accounts, sold their cars, and placed their furniture in storage." *Id*. Once they arrived in Israel, the parents placed their child in day care and sold or gave away the family's possessions in storage. *Id.* After approximately fifteen months in Israel, the mother returned to New York with the child and refused to go back to Israel. The father brought an action under the Hague

Convention, seeking the return of the child to Israel. The district court, despite acknowledging "some indicators tending to suggest that [the parties'] stay in Israel might be of indefinite duration," found that, ultimately, "[the] evidence only suggests that Mr. Gitter himself never had any intention of returning to live in New York." *Id.* at 135. On appeal, the Second Circuit found that the district court did not clearly err in concluding that there was "no settled mutual intent to make Israel [the child's] permanent home." *Id.*

In *Poliero v. Centenaro*, 373 F. App'x 102 (2d Cir. 2010), the Second Circuit affirmed the district court's finding that Italian parents who moved with their children to New York for two years did not have a shared intent to abandon Italy as the children's habitual residence. *Id*. at 105. The court made this finding despite the fact that the children attended two years of school in New York, citing evidence that the parties did not attempt to sell their family home in Italy, maintained their personal belongings and furniture in Italy, and maintained continuous connections with Italy even though they did not live there for the majority of the year. *Id*.

Taken as a whole, the evidence presented here that Respondent did not intend to make Italy the child's habitual residence is more compelling than that cited by the *Gitter* and *Poliero* courts. First, and most significantly, the parties documented their shared intention in a Separation Agreement, which expressly contemplated that the child would live and attend school in New York with Respondent. Second, Respondent testified credibly that, after executing the Separation Agreement, her willingness to attempt a reconciliation in Italy was clearly premised on the understanding that, should the reconciliation prove unsuccessful, the parties would continue to abide by the terms of the agreement. Third, the evidence suggests that, even if the parties were to reconcile, Respondent still intended to send the child to kindergarten in New York. Finally, even during Respondent's time in Italy following the Separation Agreement, Respondent retained numerous connections to New York. As already noted, Respondent maintained real estate and a law practice in New York. Additionally, she had only a New York drivers license and bank account. (Ex. I.) Respondent also kept the majority of her possessions in New York, including furniture, books, and clothing. (Cristofano Aff. ¶ 79(j); Tr. 243:4-25.) Neither Respondent nor the child had Italian passports and, on every trip to Italy, entered as tourists on 90-day visas. (Tr. 72:23-73:9.)

Thus, the evidence overwhelmingly demonstrates that, following the execution of the Separation Agreement, the parties never shared an intention to make Italy the child's habitual residence. Therefore, because Petitioner has failed to make a prima facie showing that the child was a habitual resident of Italy, the Hague Convention provides no basis for granting the relief sought by Petitioner.

## IV. CONCLUSION

The Court has no doubt that the love and concern that each party has exhibited toward the child is sincere, and that both parents have the best interests of the child at heart. Hopefully, those interests will guide each parent as they address important issues of custody and child care in future court proceedings. Ultimately, however, the Court's inquiry in this matter is limited and

somewhat technical. Accordingly, for the foregoing reasons, Petitioner's application for relief under the Hague Convention is denied. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: December 30, 2011
New York, New York

_____
RICHARD J. SULLIVAN
United States District Judge

\* \* \*

Petitioner is represented by Bonnie P. Josephs, 1776 Broadway, 21st Floor, New York, NY 10019.

Respondent is represented by Jeremy D. Morley, 230 Park Avenue, 10th Floor, New York, NY 10169.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-30-11
```

11